DANIEL E. WITTE (UT-8576)
Pearson Butler & Carson PLLC
1682 Reunion Ave., Suite 100
South Jordan, Utah 84095
Telephone: (801) 495-4104
Fax: (801) 254-9427
Email: dan@pearsonbutler.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| RUDDER HOLDING COMPANY, LLC, and ICEBERG FRANCHISING, LLC<br><br>       *Plaintiffs*,<br><br>*vs.*<br><br>F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., JOLYNN CHRISTENSEN, SHERRI CROPPER, HOLLIE JOHANSON, AND DEAN LEHWALDER.<br><br>       *Defendants.* | **COMPLAINT**<br><br>Case No:<br><br>Judge:<br><br>Discovery Tier 3<br><br>**JURY REQUESTED** |

1.      Plaintiffs Rudder Holding Company, LLC ("Rudder"), and Iceberg Franchising, Inc., ("Iceberg Franchising") (collectively, Rudder and Iceberg Franchising are the "Plaintiffs") through its undersigned counsel, hereby complain and allege against F. Kelly Christensen ("Christensen"), Anchor Holding Company, LLC ("Anchor"), 4C Shake Company, LLC, Four C Family Investment, LLC, , Shaking It Up Management Company, LLC ("Shaking it Up"); Motor City Shake Company, LLC ("Motor City"); Orem Shake Company, LLC ("Orem Shake"); Taylorsville Shake Company, LLC ("Taylorsville Shake"); Caley's Catering & Events, LLC ("Caley's Catering"); Shakemakers, LLC ("Shakemakers"); Shakemakers II, LLC ("Shake II"); Syracuse Shake Company, LLC ("Syracuse Shake"); Iceberg Opportunities, LLC ("Iceberg Opportunities"); Iceberg, Inc. ("Iceberg"), JoLynn Christensen ("JoLynn"), Sherri Cropper ("Cropper"), Hollie Johanson ("Johanson"), Dean Lehwalder ("Lehwalder") (collectively "the Defendants") as follows:

## JURISDICTION AND VENUE

2.      Plaintiffs previously initiated litigation in the Third Judicial District Court for Salt Lake County, State of Utah, entitled *Rudder Holding Company, LLC v. Christensen et al,* Case No. 100400034, which was against nearly all of the above-named Defendants.

3.      Rudder Holding Company, LLC, named to this legal action and nearly all of the above-referenced Defendants named to this legal action subsequently reached a "Settlement Agreement", which became binding on all of the Parties thereto pursuant to the last signature to the document provided on or about April 12, 2016.   A true and correct copy of the Settlement Agreement has been filed under seal as an exhibit to this Complaint.

4.      This is an action raising issues and seeking relief pursuant to various claims arising under federal questions of law and federal remedies pursuant to, inter alia and for example, the Lanham Act (e.g. 15 U.S.C. §§ 1125(a), 1114, 1116-17, 1125); the Federal Arbitration Act (e.g. 9 U.S.C. §§ 2, 4); and numerous other provisions of federal law as recited in this Complaint. Accordingly, federal subject matter jurisdiction is proper pursuant to, inter alia, 28 U.S.C. § 1338 (a-b) (federal district courts "shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights and trademarks"); 28 U.S.C. § 2201 (a) (declaratory judgment available in federal court); 28 U.S.C. § 2202 (permitting federal courts to grant "[f]urther necessary or proper relief based on a declaratory judgment"); 28 U.S.C. § 1331 (Court has subject matter jurisdiction over the federal claims). This action also asserts state law claims over which this Court has jurisdiction pursuant to the doctrine of supplementary jurisdiction and a common nucleus of operative fact, see, e.g. 28 U.S.C. § 1367(a).

5.      Provisions 26-27 of the Settlement Agreement at issue in this dispute expressly acknowledge that the Settlement Agreement was signed in Salt Lake County, that the subject matter of the Agreement has a substantial and adequate nexus to Salt Lake County for purposes of jurisdiction and venue; that performance of many aspects of the Settlement Agreement are to occur therein; that federal law and Utah law apply, excluding state choice of law principles; and that this Court is a proper and a convenient forum. Accordingly, venue and personal jurisdiction properly lies pursuant to, inter alia, 28 U.S.C. § 1391 (b)(1-2) and 9 U.S.C. § 4.

## STATEMENT OF THE CASE

### THE PARTIES AND SELECTED BACKGROUND FACTS

6.     Plaintiff Rudder Holding Company, LLC ("Rudder") is a Utah Limited Liability Company headquartered in Salt Lake County, Utah.  Its primary activity concerns the ownership and operation of the Iceberg Drive Inn® brand and enterprise.

7.     Plaintiff Iceberg Franchising, LLC ("Iceberg Franchising") is a Utah limited liability company with its primary address being 10808 S River Front Parkway, Suite 310, South Jordan, UT 84095 and its registered agent is Russell C. Skousen at 10808 S River Front Parkway, Suite 310, South Jordan, UT 84095.  Iceberg Franchising is also registered as sometimes doing business as "The Original Iceberg Drive Inn" and has formerly been named "Iceberg Operations, LLC".

8.     Defendant F. Kelly Christensen ("Christensen") is an adult Utah resident and United States citizen who has been employed since 2006 in various executive and employment related capacities within the Iceberg Drive-Inn® enterprise and with regard to individual Iceberg Drive-Inn® related legal entities.   Upon information and belief, he resides in Draper, Utah.  Since at least as early as May 11, 2006, Christensen has also held and purposefully maintained key positions of influence, decision making and control directly related to, inter alia, Anchor Holding Company, LLC; 4C Shake Company, LLC; Four C Family Investment, LLC; Shaking It Up Management Company, LLC; Shakemakers, LLC; Iceberg Opportunities, LLC; Motor City Shake Company, LLC; Orem Shake Company, LLC; and Taylorsville Shake Company, LLC. Christensen also has control over (whether legal or de facto) and a financial stake in Caley's

- 4 -

Catering & Events, LLC also doing business sometimes as XTREME Catering.  Christensen has been named as a party because of, inter alia, his adverse acts and omissions harmful to Plaintiffs as described in this Complaint.

9.     Defendant Anchor Holding Company, LLC is a Utah limited liability company with its primary address being 14663 South 800 West, Bluffdale, Utah 84065.  The current registered agent of this entity is Executive Management Services, LLC at 57 West 200 South, Suite 350, Salt Lake City, UT 84101.

10.     Defendant 4C Shake Company, LLC, is a Utah limited liability company with its primary address being 14663 S 800 W, Bluffdale, UT 84065. The current registered agent of this entity is currently listed as Executive Management Services, LLC, American Plaza II, 57 W. 200 South, Suite 350, Salt Lake City, UT 84101.

11.     Defendant Four C Family Investment, LLC is a Utah limited liability company, whose primary address is 57 W 200 South, Suite #350, Salt Lake City, UT 84101.  The current registered agent of this entity is listed as Executive Management Services, LLC, American Plaza II, 57 W. 200 South, Suite 350, Salt Lake City, UT 84101.

12.     Defendant Shaking It Up Management Company, LLC is a Utah limited liability company, whose primary address is not listed with the Utah Department of Commerce, Division of Corporations and Commercial Code, but whose registered agent is currently listed as Executive Management Services, LLC, American Plaza II, 57 W. 200 South, Suite 350, Salt Lake City, UT 84101.

13.     Defendant Shakemakers, LLC is a Utah limited liability company, whose primary address is 57 W. 200 South, Ste. 200, Salt Lake City, UT 84101 and whose current registered agent is Executive Management Services, LLC at 57 West 200 South STE 350, Salt Lake City, UT 84101.

14.     Defendant Motor City Shake Company, LLC is a Utah limited liability company with its primary physical address being 14663 South 800 West, Bluffdale, UT 84065 and with its current registered agent being Executive Management Services, LLC at 57 West 200 South STE 350, Salt Lake City, UT 84101.  Motor City Shake Company, LLC is also registered in Utah as sometimes doing business as Iceberg Drive Inn – Sandy.

15.     Defendant Orem Shake Company, LLC is a Utah limited liability company with its primary physical address being 14663 South 800 West, Bluffdale, UT 84065 and with its current registered agent being Executive Management Services, LLC at 57 West 200 South STE 350, Salt Lake City, UT 84101.

16.     Defendant Taylorsville Shake Company, LLC is a Utah limited liability company using 1519 West 5400 South, Taylorsville, UT and 3906 S. 900 North, Salt Lake City, Utah as its physical address, with its primary business activity centered in Utah and with its current registered agent being Executive Management Services, LLC at 57 West 200 South STE 350, Salt Lake City, UT 84101.

17.     Defendant Caley's Catering & Events, LLC is a Utah limited liability company using P.O. Box 104 Draper, Utah 84020 as its primary office contact address and Kellyc@iceberdriveinn.com as its main email contact, 57 West 200 South Ste #350 as its physical

location, and its current registered agent being Executive Management Services, LLC at 57 West 200 South STE 350, Salt Lake City, UT 84101.

18.     Defendant, Iceberg Opportunities, LLC is a Utah limited liability company with its primary address being 14663 South 800 West, Bluffdale, UT 84065 and its current registered agent is Executive Management Services, LLC at 57 W. 200 S. #350, Salt Lake City, UT 84101.

19.     The Iceberg restaurant chain started in the 1960s, and has since expanded to various locations throughout Utah and elsewhere to serve millions of customers with its unique hamburgers, French fries, shakes, onion rings, fry sauce, and other items.

20.     Pursuant to provisions 2, 10-11, of the Settlement Agreement, Rudder wholly owns and controls Iceberg Franchising, and Iceberg Franchising in turn wholly owns and controls all "Iceberg IP" as defined in, inter alia, provision 2 of the Settlement Agreement; Anchor, on the other hand, owns Iceberg Opportunities.

21.     During all relevant times, Christensen has held and maintained various key positions of influence, decision making and control over the various entities collectively listed as Defendants in this complaint.  At all relevant times, Christensen's mother, JoLynn, and also JoLynn's partner Cropper, have collaborated to manage, control, coordinate, and own some of the various Defendant entities, including with regard to various aspects of non-compliance with the terms of the Settlement Agreement.  All of the named Defendants except Hollie Johanson and Dean Lehwalder signed the governing Settlement Agreement, as did the Plaintiffs.  Hollie Johanson and Dean Lehwalder are managers and/or agents of Christensen who have assisted with Christensen's scheme to confuse the public and actual and potential customers of Iceberg into

thinking that Christensen's non-Iceberg operations are affiliated with, sponsored by, endorsed by, successors of, substantially the same as, and/or identical to Iceberg and Iceberg operations, food, and/or Iceberg IP, and have assisted and facilitated Christensen's scheme to, inter alai, violate the contractual provisions set forth in this complaint, and also misappropriate, misuse, and/or harm Iceberg IP.

22.     At the time the Settlement Agreement was signed, Iceberg Opportunities as an entity owned and ran five (5) Iceberg Drive-Inn Restaurants at the following locations: Taylorsville, Utah ("Taylorsville Iceberg"); Syracuse, Utah ("Syracuse Iceberg"); Orem, Utah ("Orem Iceberg"); Sandy, Utah ("Sandy Iceberg"); and the Motor City, Salt Lake City, Utah ("Motor City Iceberg") (the Taylorsville Iceberg, Syracuse Iceberg, Orem Iceberg, Sandy Iceberg and Motor City Iceberg shall be known collectively as the "Christensen Iceberg Stores", which is the same term and same definition for the term utilized in Recital A of the Settlement Agreement).

23.     At the time the Settlement Agreement was signed, and at various time previous, and still presently, Iceberg was associated with the name "Shakemakers".  Specifically, "Shakemakers" and various entities called "Shakemakers" were, and still are, used in connection with ownership and operation of Iceberg restaurants.  As part of settlement, Christensen, JoLynn, and Cropper were allowed to retain the 3900 Iceberg qua an Iceberg license and to continue utilizing "Shakemakers" in connection with existing grandfathered entities using that name in connection with some existing grandfathered Iceberg activities and related operations.  However, as set forth in more detail elsewhere in this complaint, the intent and design of the Settlement Agreement was to afford a limited license designed to grandfather some existing business entities

and operations associated with and/or taking place in connection with the 3900 Iceberg and its franchise territory—not to allow either "Iceberg" or "Shakemakers" to be used by Defendants anywhere outside the 3900 Iceberg territory or for any purposes that were unauthorized or that would serve to create a likelihood of confusion in the minds of the public about what operations of Defendants are properly licensed as Iceberg or about the nature of any relationship (or more precisely, the complete absence of any relationship) between the Iceberg franchise and Iceberg IP as now owned by Plaintiffs and Defendants' non-Iceberg businesses and activities as such exist outside of the grandfathered 3900 Iceberg territory.  Most notably, and as discussed further elsewhere, "Shakemakers" and "Shake Makers" were not supposed to become the name of any of Defendants' non-Iceberg stores or be otherwise used to create a likelihood that members of the public would think there is a common operation, brand, franchise, legal operation, or other relationship between Iceberg, including without limitation 3900 Iceberg as operated through the Shakemakers entity, and other non-Iceberg stores that Defendants have now taken to improperly calling "Shake Makers"  restaurants.

24.     Some of the key concerns motivating the earlier lawsuit and eventual terms of the resultant Settlement Agreement were related to Plaintiffs' concerns that Defendants, and most especially Christensen and the entities and operations under Christensen's control, conducted their operations in a way that was, inter alia, insufficiently honest; lacking in the use of sound business principles; lacking in the use of sound financial principles; lacking in proper accounting and the fair allocation of revenues and correct assumption of debts and liabilities; ensnared in acts and omissions that were harming Iceberg intellectual property and goodwill for the Iceberg franchise;

and lacking the use of sound upkeep, repair, cleanliness, and maintenance as to personal property assets, real property assets, furniture, fixtures, equipment, buildings and other assets of various store locations; and lacking in adequate customer service, quality control and professionalism as to various store locations.  Accordingly, the Settlement Agreement was designed to, among other things, 1) transition Defendants out of personally running, owning, or managing any Iceberg stores other than the one located on 3906 South 900 East, Salt Lake City, Utah 84124 (the "3900 South Iceberg"), by requiring all Christensen Iceberg Stores to be sole or adequately de-branded into non-Iceberg restaurants or business within  on or before a date that is three hundred sixty-five (365) days after the date when the Settlement Agreement has been signed by all relevant parties (the "Transition Date"), 2) transfer all ownership and control of Iceberg intellectual property (collectively denoted "Iceberg IP" in the Settlement Agreement) to Plaintiffs, while according a limited license for limited grandfathered activity in connection with the 3900 South Iceberg, 3) prevent Defendants from engaging in any acts or omissions that would create the danger of a likelihood of confusion in the minds of customers or the general public between Iceberg franchise operations, products, stores, and services on the one hand, and any businesses that Defendants have or will operate at any time (aside from the 3900 South Iceberg location), and 4) create mutually accepted delineation of financial rights and obligations on a going-forward basis so that Plaintiffs could receive some reasonable remedies and assure that they would be disentangled in all respects, and in a conspicuous, fully-documented manner, from any financial issues or operations associated with Defendants.

## SOME KEY EXEMPLAR PROVISIONS OF THE SETTLEMENT AGREEMENT

25.     Accordingly, provision 2 of the Settlement Agreement, in relevant part with emphasis added, provided as follows:

Contemporaneously with, and as part of, this Agreement by the Parties, Iceberg Opportunities hereby *transfers the Iceberg Trademark to Iceberg Franchising, along with all trademarks, copyrights, trade dress, service marks, business names, registrations, internet domain addresses, doing business names, trade secrets, recipes, milkshake formulas and mixtures, menu names and listings, common law marks, brands, licenses, distinctive decor, and other intellectual property associated with the Iceberg franchise and business enterprise (collectively the "Iceberg IP"),* subject to the limited licenses granted in provisions 7 and 9 of this Agreement. This transfer is further documented in Exhibit A to this Agreement.

26.    Provision 4 of the Settlement Agreement, in relevant part and with emphasis added,

provided as follows:

Upon the execution of this Agreement, *Iceberg Opportunities will either sell the Christensen Iceberg Stores as franchises under Iceberg Franchising* (and subject to the standard Iceberg Franchise agreement for franchise operations, attached as Exhibit D and subject to direct going-forward enforcement by Iceberg Franchising against the new franchise owner(s)), *or will rebrand the Christensen Iceberg Stores on or before a date that is three hundred sixty-five (365) days after the date when this Agreement has been signed by all relevant parties (the "Transition Date")* (with such stores and their managers and owners not subject to the standard Iceberg Franchise agreement, and not subject in any way to the oversight, inspection, ownership, or control of Iceberg Franchising, but *not entitled to any use of the Iceberg Trademark or Iceberg IP). The Christensen Iceberg Stores shall have a license to use the Iceberg Trademark and Iceberg IP until the Transition Date. If Christensen Iceberg Stores, or any portion of them, elect to rebrand rather than become subject to the standard Iceberg Franchise agreement, the specific store(s) electing to rebrand shall immediately and simultaneously cease all use of the Iceberg Trademark and any aspects of Iceberg IP.* Ceasing use of all aspects of the Iceberg IP shall prevent the Christensen Iceberg Stores from using *color combinations that are substantially similar to the current color combination schemes and/or substantially similar to those used by Iceberg Franchising*, and using a *different color scheme and entirely different signage will be required for each and any store that may at any time be debranded*. Any re-branding of any Iceberg store location must include, inter alia, *use of distinctly different signage, color schemes, menus, logos, and signage.* Proposed rebranding color schemes and signage may be submitted to Iceberg Franchising in advance to ensure the absence of any objection from Iceberg Franchising before implementation of re-branding; *in the absence of mutual agreement in writing about the lack of danger of customer confusion and the acceptability of the re-branding designs and color schemes, a neutral arbitrator with expertise in principles of intellectual property and trade dress shall be selected by both parties to resolve in binding fashion and with binding authority whether the proposed re-branding*

*plans are sufficiently distinct to avoid infringement upon Iceberg trade dress and to avoid consumer confusion (and what modifications to the proposed plan would be adequate, if any should be needed)*. In order to select the neutral arbitrator, Iceberg Franchising shall nominate an arbitrator expert and the other relevant party(ies) shall nominate an arbitrator expert and both nominated experts shall confer to select the neutral arbitrator; only the neutral arbitrator shall review and make the substantive determinations relative to implementing this provision. *An election to rebrand, if any, shall be deemed to have occurred at each relevant specific store of the Christensen Iceberg Stores on the earliest of the following dates (the "Rebranding Date") relevant to that particular store: a) the date when any store shall hold itself out to the public or to any third party as anything other than an "Iceberg"* business, restaurant, and/or legal entity, posting any governmental entity, or creating any signage or notice or advertisement identifying any of the Christensen Iceberg Stores or 3900 South Iceberg as anything other than an "Iceberg" location, or altering the existing use or trade dress of a location to the point that more than thirty percent (30%) of exterior square foot surface of a store or more than thirty percent (30%) of interior square foot surface of a store has been de-branded; *b) the date that any new purchase or transfer of ownership of a store, in whole or in part, shall occur* without the express signed consent of Iceberg Franchising pursuant to a standard Iceberg Franchise agreement for the new purchaser or owner; *or c) on the Transition Date, for any store that shall reach that date without having first engaging in a qualifying transaction as described in b)*. With respect to any de-branding and re-branding, there shall be *no extended period of time where a store continues to hold itself out as an "Iceberg" after material re-branding change to new menus, trade dress, signage, and/or repainting of premises to a non-Iceberg appearance; a good-faith effort shall be made to coordinate and time transition activities so that such changes and the de-branding from use of the Iceberg name itself shall occur within no more than fourteen days of each other.*

27.     Provision 4.b. of the Settlement Agreement, in relevant part and with emphasis added, provided as follows:

Under this Agreement, the Christensen Iceberg Stores will not charge any royalties to the Christensen Iceberg Stores between entry of this Agreement and the Transition Date, except that the *Sandy Iceberg shall continue to pay a three percent (3%) royalty from the date this Agreement is signed until the Transition Date.* Upon entry into this Agreement, the *Sandy Iceberg will begin paying the royalties that are currently due and owing moving forward at the rate of 3%* and will not continue to pay past due and owing royalties.

28.     Provision 4.c. of the Settlement Agreement, in relevant part and with emphasis added, provided as follows:

To the extent the Sandy Iceberg is either sold or rebranded by the Transition Date, and provided that the ***three percent (3%) royalty and 2% advertising fee are current (meaning that the Sandy Iceberg has paid current royalties that are due and owing after entry into this Agreement) and paid as of the Transition Date, Iceberg Franchising will as return consideration forgive any debt due and owing by Christensen or any or all Defendants to Iceberg Franchising related to the Sandy Iceberg, in an amount that has accumulated up through April 3, 2016. A material precondition and condition subsequent of the forgiveness of all debt up through April 3, 2016 is material and objective good faith compliance by the Christensen Iceberg Stores with provisions 5 and 6 of this Agreement***; the ***debt forgiveness shall be forfeited or reversed if this material condition to performance of debt forgiveness is not satisfied***.

29.    Provision 5 of the Settlement Agreement, in relevant part and with emphasis added,

provided as follows:

The Parties agree that during the period(s) of time between the date when this Agreement is signed and Rebranding Date/Sale Date for each relevant store of the Christensen Iceberg Stores, ***each store shall for the relevant period of time implement the applicable list of repairs and upgrades in maintenance specified in Exhibit C. Such repairs and upgrades shall be accomplished before the deadlines set forth in Exhibit C*** . . . .

30.    Provision 6 of the Settlement Agreement, in relevant part and with emphasis added,

provided as follows:

The 3900 South Iceberg store and the Christensen Iceberg Stores shall be entitled to keep all Manufacturer Rebates accruing from the date of this Agreement until the applicable Transition Date for each Christensen Iceberg Store has elapsed. ***The Manufacturer Rebates shall be used toward repairs, maintenance upgrades, and improvements to the customer experience at the Christensen Iceberg Stores, and the list of upgrades and repairs set forth in Exhibit C shall receive first priority for such funds. In connection with the inspections set forth in provision 5 of this Agreement, the inspector may request documentation reasonably needed to verify that the Manufacturer Rebates have actually been applied and expended for purposes consistent with this provision 6.*** Wherever practicable, Manufacturer Rebates shall be attributed to, and accounted for in relation to, the specific store responsible for generating each relevant rebate. Iceberg Opportunities agrees that Manufacturer Rebates shall be applied to the purposes set forth in this provision and this Agreement, and, upon request, the Christensen Iceberg Stores shall provide documentary proof to verify the amount of manufacturer rebates received and the amount spent on the repairs set forth C, and plans for additional repairs to be made with any remaining unspent funds. ***To the extent the manufacturer rebates exceed the amount required to make the repairs set forth in Exhibit C, Iceberg Opportunities is entitled to keep those rebates until the Transition Date.***

31.     Provision 7 and 7 a.-b., d., h.-j. of the Settlement Agreement, in relevant part and

with emphasis added, provided as follows:

**_Shakemakers, LLC._** Upon the execution of this Agreement and the transfer of the
Iceberg Trademark and Iceberg IP to Iceberg Franchising, Iceberg Franchising hereby grants
a perpetual and royalty-free **_license to Shakemakers_** (or its successors, so long as the owners
are Kelly Christensen, JoLynn Christensen, Sherri Cropper, and/or their heirs and permitted
assignees) to **_use the Iceberg Trademark and Iceberg IP for the 3900 South Iceberg_**.

a. This **_license_** for the **_3900 South Iceberg is limited to commercial activity in its
existing geographic location within the existing 3900 South Iceberg franchise
area_** as defined pursuant to paragraph 4(d) of this Agreement, and **_cannot be
relocated to a new location or used in any way to materially deprive Rudder and
Iceberg Franchising of the benefit of their bargain with regard to full and
unbridled exploitation of the franchising and intellectual property rights
acquired in connection with the Iceberg Trademark and Iceberg IP_**. . . . The 3900
South Iceberg location is permitted to use general marketing and advertising
methods to promote commercial goods and services **_within the 3900 South Iceberg
franchise territory_** (for example, using a Utah television station to advertise a
special sale for shakes at the 3900 South Iceberg location, even though the
advertisement will reach people outside the 3900 South Iceberg franchise territory,
so long as the advertisement conspicuously limits the offer to the 3900 South
Iceberg location). The **_license for 3900 South Iceberg is to grandfather existing
commercial activity (except any existing commercial activity that if continued
would violate express going-forward prohibitions in the terms of this Agreement)
and cannot be divided, expanded, or multiplied so as to apply to any additional
stores, new stores, and/or store locations. The license cannot be extended to new
mediums, marketing distribution methods, or new operations that are not
substantially in the nature of the retail restaurant outlet operations currently
being conducted by the 3900 South Iceberg as of the date of this Agreement,
and/or that are outside the existing local geographic footprint for the existing
3900 South Iceberg location._** For example and without limitation, the license
would not allow use of the 3900 South Iceberg license to utilize the Iceberg
Trademark or Iceberg IP for . . . franchising; use of . . . outlets off of the existing
real estate owned by the 3900 South Iceberg; . . . **_offsite sales with or through any
third party (except Caley's Catering as outlined in this Agreement) or use of
television or radio marketing or distribution to sell consumption of food
anywhere other than on the premises of the 3900 South Iceberg property._** To the
extent any other Iceberg franchises engage in any of the above mentioned activities,

they shall be prohibited from taking such actions or delivering food to the 3900 South Iceberg franchise area as defined pursuant to paragraph 4(d) of this Agreement. . . . ***No Iceberg Trademark or Iceberg IP may be used on the exterior of any vehicle*** belonging to, or controlled or operated by, Shakemakers, LLC or its 3900 South Iceberg store, except as permitted under the Caley's Catering license in provision 9(b). . . .

b.  ***This license for the 3900 South Iceberg is limited to the Iceberg Trademark and Iceberg IP in the forms and iterations and formats that exist as of the date this Agreement is signed.*** . . .

         . . . .

d.  ***Neither the 3900 South Iceberg nor any of the other parties may use any brand, slogan, motto, trademark, service mark, name, representation, promotion, or advertisement of any kind containing the phrase or concept of "Original Iceberg"*** . . . .

. . . .

h.  So long as ***Shakemakers and the 3900 South Iceberg*** wish to make use of the ***limited license set forth herein***, they ***must honor any food or shake promotions and/or coupons that Iceberg Franchising may implement or approve for use by customers for all outlet stores throughout the franchise system*** . . . .

i.  ***Shakemakers and the 3900 South Iceberg*** may join any advertising cooperatives that may be formed, if other participants are willing, but may not join any future franchisee association(s) that may be created.

j.  ***Shakemakers and the 3900 South Iceberg must at all times either utilize the Iceberg Trademark and Iceberg IP in a saturated and comprehensive fashion in connection with the 3900 South Iceberg location, or else wholly rebrand the 3900 South Iceberg store and use none of the aspects of Iceberg IP whatsoever. At no time shall the Iceberg Trademark, Iceberg IP, and Iceberg imprimatur be mingled or diluted so as to risk confusing customers and the public,*** and/or so as to dilute or imperil the Iceberg brand and legal protections or enforceability for the Iceberg Trademark or Iceberg IP. If the 3900 South Iceberg store is ever rebranded in whole or in part, the limited license shall be permanently forfeited. Shakemakers and the 3900 South Iceberg may rebrand away from use of the Iceberg Trademark and Iceberg IP at any time.

. . . .

- 15 -

32.     Provision 9.e. of the Settlement Agreement, in relevant part and with emphasis added, provided as follows:

> Neither the Caley's Catering *nor any of the other parties may use any brand, slogan, motto, trademark, service mark, name, representation, promotion, or advertisement of any kind contain the phrase or concept of "Original Iceberg"* . . . .

33.     Provision 18 of the Settlement Agreement, in relevant part and with emphasis added, provided as follows: "*Until the Transition Date*, the Christensen Iceberg Stores shall be able to *keep the same menus and menu formats* as such are currently posted and used on the date this Agreement is signed . . . "

34.     Under "Exhibit 'C'" of the Settlement Agreement, the Christensen Iceberg Stores were required to complete the following schedule of repairs, using April 1, 2016, as the baseline from which deadlines accrue, but failed to do so:

> <u>Sandy Iceberg Store</u>
> Broken Window 45 Days
> Various lights out 45 Days
> Some ceiling tiles need to be replaced 45 Days
> Misc paint touch up 45 Days
>
> <u>Taylorsville Iceberg Store</u>
> Water damage on ceiling by drive through 90 Days
> Hole in womens restroom wall 30 Days
> Dirty air returns in lobby 45 Days
> Broken window and wood covering it 90 Days
> Awnings 180 Days
> 2 booths ripped 30 Days
> Stickers covering mis-prints on menu boards 30 Days
> Broken pavement/holes in drive thru pavement 180 Days
> Power wash building 180 Days
>
> <u>Syracuse Iceberg Store</u>
> Various lights out 45 Days
> Ripped corner booth 30 Days
> Lights and covers under hood 45 Days

Lights and covers in walkin 45 Days
Menu board needs replacement 180 Days
Outside menu board needs new plex or existing plex polished 90 Days
Dumpster door 180 Days
Hood needs cleaning 30 Days
Heat lamp on pass through window 30 Days

*Orem Iceberg Store*
Roof fix/replacement 180 Days
Water damage in lobby along north side 180 Days
Middle HVAC unit needs replacement 365 Days
Awnings 180 Days
Missing doors on trash cans 90 Days
Ripped booth 30 Days
Needs new blinds 30 Days
Light cover in mens room 45 Days
Tape on outside drive through 180 Days

35.     Provision 12 of the Settlement Agreement (emphasis added), in relevant part

provided as follows:

In order to **enforce this Agreement**, the parties shall be entitled to the **widest range of legal actions, claims, and legal theories afforded that are not inconsistent with the express provisions of this Agreement**. Without limitation, the **Parties shall be able to enforce the provisions of this Agreement through declaratory, injunctive, equitable, monetary, special, and punitive relief; through specific performance; through an accounting reasonably tailored to a verification or remedy in relation to the grievance or concern asserted; and through law, equity, and all available theories of local, state, federal, treaty, and international law**.

36.     Provision 33 of the Settlement Agreement (emphasis added), in relevant part

provided as follows:

In **any judicial or non judicial action to enforce or interpret** the provisions of this Agreement, the **prevailing party shall be entitled to recover its reasonable attorneys' fees and costs incurred from any other party in breach of the terms** hereof.

**SOME EXEMPLAR WRONGFUL ACTS AND OMISSIONS OF DEFENDANTS IN LIGHT OF SETTLEMENT AGREEMENT OBLIGATIONS, COVENANT OF GOOD FAITH AND FAIR DEALING, INTELLECTUAL PROPERTY LAW, TORT LAW, AND OTHER PROTECTIONS OF LAW**

37.     Notwithstanding the various provisions of the Settlement Agreement in this Complaint, Defendants have since engaged in numerous wrongful acts and omissions that breach the Settlement Agreement; breach the covenant of good faith and fair dealing associated with the Settlement Agreement; and violate trademark, trade secret, copyright, trade dress, and other aspects of intellectual property law, tort law, and other law.  These acts and omissions include, but are not limited to, exemplar instances as described in the following paragraphs of this Complaint.

38.     Pursuant to provision 4 of the Settlement Agreement, all Christensen Iceberg Stores were supposed to be appropriately sold or debranded no later than the Transition Date on April 12, 2017 (a one-week extension was granted by Plaintiffs for the Taylorsville location only). In no event was Christensen or any other Defendant supposed to be personally owning or operating the Orem, Motor City, or Taylorsville locations (collectively, the Orem, Motor City, and Taylorsville locations are the "Non-compliant Locations") as Iceberg locations after the Transition Date (or after one week subsequent to the Transition Date, with regard to Taylorsville). Furthermore, if Defendants decided to continue owning and operating the Non-compliant Locations after the Transition Date (or after one week subsequent to the Transition Date, with regard to Taylorsville), Defendants were required to completely debrand those Non-Complaint Locations by the Transition Date so that those establishments would no longer be utilizing any Iceberg IP as defined in, inter alia, provision 2, Exhibit A, and Exhibit B of the Settlement Agreement.  However, notwithstanding the Settlement Agreement terms and obligations, Defendant's Noncompliant

Locations were not in compliance with the debranding requirements as of the Transition Date (or as of one week after the Transition Date, in the case of Taylorsville).  Numerous violations have been occurring, after the Transition Date, and even now many violations are still occurring at the Non-Compliant Locations on an ongoing basis.

39.     Without limitation, Defendants failed to timely terminate use of the Iceberg Trademark at one or more of the Non-Compliant Locations.

40.     Without limitation, Defendants failed to timely remove Iceberg signs, names, and logos from interior and exterior surfaces of the buildings in one or more of the Non-Compliant Locations.

41.     Without limitation, Defendants failed to timely remove Iceberg signs, names, and logos from customer receipts and other items seen by customers in one or more of the Non-Compliant Locations.

42.     Without limitation, Defendants failed to timely replace Iceberg's distinctive red, white, and blue color scheme, black and white tiles, booths, and other aspects of Iceberg's distinctive decor and trade dress in one or more of the Non-Compliant Locations.  Indeed, Defendants continue to use color schemes, marketing approaches, distinctive menu names and menus, and color schemes designed to be the same, rather than different, than the Iceberg color schemes.  This includes, without limitation, use of red, white and blue in combination, use of red and blue in combination, use of checkboard patterns (including checkerboard patterns with red and white, as well as black and white), as part of signage, wall décor, booth decor, flooring, food containers, and/or beverage containers for one or more Non-Compliant Locations.

43.     Without limitation, Defendants failed to timely replace Iceberg's distinctive employee uniforms in one or more of the Non-Compliant Locations.

44.     Without limitation, Defendants failed to timely substitute in new replacement menus and menu listings in one or more of the Non-Compliant Locations.

45.     Without limitation, Defendants failed to timely replace Iceberg recipes, milkshake formulas and mixtures, products, and food in one or more of the Non-Compliant Locations.

46.     Without limitation, Defendants failed to timely replace Iceberg's distinctive double-cupping technique for shakes.

47.     Without limitation, Defendants failed to timely replace the distinctive Iceberg inch-thick onion rings.

48.     Without limitation, Defendants failed to stop using onions of diameters greater than 3 inches to make onion rings that are distinctive of Iceberg.

49.     Without limitation, Defendants who have or have had access to Plaintiff's trade secrets are developing Defendants' recipes, products, procedures, and protocols.

50.     Without limitation, Defendants failed to timely replace Iceberg's distinctive fry sauce recipe.

51.     Without limitation, Defendants have appropriated Plaintiff's blue-and-white striped decoration on its cups and used the same on Defendants' awnings at least one location.

52.     Without limitation, Defendants have failed to timely replace Iceberg's recipes, formulas, serving styles, distinctive ingredients, containers, trade dress, menu names, menu formats, menu descriptions, and have otherwise tried to confuse consumers with use of Iceberg IP,

marketing techniques, representations, food, products, and service designed to create the impression of authorized interchangeability and interrelationships between Plaintiff's Iceberg franchise and official Iceberg locations on the one hand and the Non-Compliant Locations on the other.

53.     Without limitation, employees and managers of the Defendants have been telling customers even after the Transition Date that Shake Makers will be serving the same food and specialty items as used to be available when the locations were temporarily licensed as Iceberg locations under the Settlement Agreement; that Christensen runs the "original Iceberg"; that Shake Makers will essentially be the same old Iceberg restaurant with just a different name; and that there will be continuity, similarity, and relationship between Iceberg and "Shake Makers" as such exists in connection with the Non-Compliant Locations.  Phones for the Non-Compliant Locations have been answered as "Iceberg" after the applicable deadlines for de-branding.  Christensen and employees of the Defendants have used signs, business cards, email signature blocks, receipts, or other tactics and devices that impermissibly mingle or combine with the names or elements of trade dress of Iceberg and Shakemakers as associated with the vestigial license arrangement limited to the 3900 Iceberg location.

54.     Without limitation, Defendants failed to timely inform customers that the Non-Compliant Locations were no longer Iceberg locations and that they would no longer be serving Iceberg products or food, and indeed affirmatively informed customers that Christensen will continue to run and own the "original Iceberg" at the 3900 South Iceberg location; that the exact same food products will continue to be sold at Christensen's re-branded locations, even though the

name has been changed from "Iceberg"; and that the employees had been expressly told to do all of this by their management.

55.     Without limitation, one or more of the Non-Compliant Locations are now branded as "Shake Makers" restaurants, despite the fact that Defendants were only supposed to make vestigial, limited license use of "Shake Makers" or Shakemakers" in connection with the 3900 South Iceberg along with other aspects of the Iceberg imprimatur and Iceberg IP at the 3900 South Iceberg location.  Use of "Shake Makers" at the non-Iceberg, Non-Compliant Locations is clearly designed to created confusion in the minds of vendors, customers, and other members of the public. By using "Shake Makers" Defendants are impermissibly attempting to cause vendors, customers, and other members of the public to perceive continuity and continued affiliation/similarity as to Iceberg and the Non-Complaint Locations in a way that violates both the letter of the Settlement Agreement and the intended essence of the bargain to be bestowed through the Settlement Agreement.

56.     Without limitation, Christensen and the Defendants entities under his control have an outstanding and accruing unpaid debt to Plaintiffs of at least thirty thousand dollars ($30,000.00). This is so because, inter alia, Christensen and his relevant entities have failed to make promised royalty and ad fee payments; failed to provide required payments in connection with rebates; failed to reimburse shake card and gift certificates; failed to pay amounts due for taxes; and otherwise failed to maintain strict and good faith compliance with the terms of the Settlement Agreement as required to qualify for contingent forgiveness of past debts.  Christensen

has told representatives for Plaintiffs on a number of occasions in the past couple of months that checks in relation to various invoices would be sent, but such assurances have gone unfulfilled.

57.     Without limitation, Defendants made no effort to avail themselves of the safe-harbor pre-clearance compliance opportunity and little or no effort to comply with transition efforts during the permissible year-long transition period afforded them under provision 4 of the Settlement Agreement.

58.     Without limitation, Defendants contested Plaintiffs' request for a binding arbitrator capable of administering remedies; Defendants attempted to demand that the arbitration be reduced to a scope that was so limited as to be impractical; and Defendants also demanded that the binding arbitrator would have no power to actually afford any remedies or enforce decision-making. Defendants also asserted they could not be held liable for costs of the arbitrator fee and litigation costs even if they were found to be in the wrong.

59.     Defendants failed to act in a timely, good-faith manner to comply with various financial, transitional, and debranding obligations under the Settlement Agreement, including with regard to the Non-Compliant Locations and transitioning by April 12, 2017.

60.      Within their network of family-controlled entities, Defendants (including their entities, employees, and representatives), have endorsed, facilitated, promulgated, aided, abetted, assisted, encouraged, conspired, and ratified in regard to the acts of Christensen and the various other Defendants  at the forefront of committing the acts and omissions in breach of the Settlement Agreement, and Defendants have thereby profited from the benefits and revenues improperly derived from their common scheme.  Further, Defendants have mingled assets, resources, and

facilities in the accomplishment of their scheme and pattern of breach and other improper acts and omissions as set forth in this Complaint.

61.     Defendants' acts and omissions have been intentional, reckless, and negligent, and have resulted in grave harm to the image, goodwill, and imprimatur of Iceberg.  Without limitation, this includes inadequate maintenance of physical facilities and inadequate operations in support of customer service under Defendants' control, such that the customer and public perception of Iceberg is deteriorating and harm is accruing to the Iceberg experience, brand, and goodwill.

62.     Defendants' conduct has not only been directly harmful to Plaintiffs and to Iceberg but has unfairly and unjustly enriched Christensen and the other named Defendants such that disgorgement is needed in order to alleviate inequity, and compensation is needed for use of Iceberg IP beyond the temporary duration and limited scope permitted by limited and vestigial licenses afforded under the Settlement Agreement.

63.     Defendants have harmed, infringed upon, and misappropriated the Iceberg Drive Inn® trademark and other Iceberg IP as identified under the Settlement Agreement.

64.     Defendants are jointly and severally liable for the harm caused by their wrongful and conspiratorial acts and omissions.

65.     Defendants, on information and belief, utilize agents and other third parties to execute wrongful acts described herein and such wrongful acts by their agents and other third parties are attributable to Defendants.

66.     Defendants' wrongful acts and omissions, which are, among other things, in breach of contract and of the covenant of good faith and fair dealing, and also separately in violation of

other statutes and tort principles set forth in this Complaint, have caused a wide range of harm to the Plaintiffs, both monetary and otherwise, including but not limited to harmed reputation, brand and market goodwill, legal costs and fees, and consumption of labor and time of Plaintiffs' representatives and employees.  As a result of each individual breach of contract, and the combined effect of the multiple defaults and breaches, Plaintiffs have suffered substantial actual damages, in an amount to be determined at trial, which is ever accruing but not less than $900,000.

67.     The harm caused and being caused by the above-specified defaults and breaches, individually and together, is immediate, ongoing and irreparable, meaning that monetary damages alone are insufficient to cure the totality of the harm suffered by Plaintiffs.  Therefore, in addition to the monetary damages that will be shown at trial, Plaintiffs are entitled to equitable relief, including without limitation in the form of declaration, and also an injunction forbidding and enjoining the Defendants in this matter from continuing to materially harm Plaintiffs, pertaining to the acts or related to acts, as alleged herein.

68.     Plaintiffs respectfully seek all legal fees, legal costs, expenses, arbitration costs, and prejudgment interest to which they are entitled under, inter alia, provision 33 of the Settlement Agreement and the provisions of all applicable laws, statutes, regulations, and precedents under federal law and also under Utah state law.

69.     Due to the surreptitious acts and omissions of the Defendants, investigation is ongoing; the full extent of the wrongful acts and omissions, and the identities of all entities and individuals involved, is still being uncovered, and Plaintiffs reserve the right to amend this complaint if and when such information comes to light.

70.     Wherefore Plaintiffs bring this action to enjoin Defendants from their wrongful and harmful conduct; to obtain declaratory relief that will enable Plaintiffs to continue successfully rehabilitating the operations, supervision, control, title, review, imprimatur, quality control, goodwill, and image associated with the Iceberg franchise; to recover damages from Defendants for their wrongful acts and omissions; to obtain the other relief prayed for in this Complaint, and such other just and fair compensation, reimbursement, penalties, costs, fees and other orders of the above-captioned Court, as shall be equitably determined through this action.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, AND ICEBERG, INC.)*

71.     Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

72.     As recited in this Complaint, Defendants have through their acts and omissions breached numerous provisions of the Settlement Agreement, including without limitation the cited and/or highlighted provisions and terms herein such as those quoted from Settlement Agreement provisions 2, 4, 4.b., 4.c., 5, 6, 7, 7 a.-b., d., h.-j., 9.e., 12, 18, 33, Exhibit A, and Exhibit C.  Without limitation, some of the most important examples of how the Settlement Agreement has been breached are described in this Complaint under the subsection entitled "Some Exemplar Wrongful Acts And Omissions Of Defendants In Light Of Settlement Agreement Obligations, Covenant Of

Good Faith And Fair Dealing, Intellectual Property Law, Tort Law, And Other Protections Of Law."

73.     As recited in the Complaint, Defendants' acts and omissions in breach if the Settlement Agreement have caused damage to the Plaintiffs in an amount subject to proof but at least $900,000.

**SECOND CAUSE OF ACTION**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, AND ICEBERG, INC.)*

74.     Plaintiffs incorporates all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

75.     This cause of action is brought in connection with the Settlement Agreement, and in the alternative as to the foregoing to the extent that may be relevant.

76.     As with all contracts, the law in Utah is clear that the Settlement Agreement contains an implied covenant of good faith and fair dealing that requires the parties to do nothing to prevent the other from enjoying the benefit of the bargain conferred upon the other parties by the contract.

77.     The acts by the Defendants, as set forth herein, were willful actions and inactions which have plainly prevented Plaintiffs from enjoying the benefits of the bargain contained in and contemplated by the contracts executed between them.  Each such act, and each act further detailed herein, constitutes a breach of the implied covenant of good faith and fair dealing.

78.    As a result of these breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered substantial damages, in an amount to be determined at trial, but together no less than $900,000.

### THIRD CAUSE OF ACTION
### ACCOUNTING PURSUANT TO SETTLEMENT AGREEMENT
*(ANCHOR HOLDING COMPANY, LLC & CHRISTENSEN, INCLUDING WITHOUT LIMITATION IN RELATION TO ICEBERG OPPORTUNITIES, LLC AND ICEBERG FRANCHISING, LLC)*

79.    Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

80.    Pursuant to provision 12 of the Settlement Agreement, and separately under other principles of statutory law and common law (see e.g. U.C.A. § 48-1d-403 (1-8) due to vestigial debts of a former partnerships, Plaintiffs are entitled to, inter alia, an accounting concerning all profits, revenues, income, and royalties obtained by Defendants as to, without limitation, revenues accrued and/or owed in connection with  the terms and/or breach and/or enforcement of Settlement Agreement provisions 2, 4, 4.b.,  4.c., 5, 6, 7, 7 a.-b., d., h.-j., 33, and Exhibit C, including without limitation  all assets in the nature of intangible assets and intellectual property (e.g. any and all ICEBERG trademarks, business names, service marks, copyrights, trade dress, trade secrets, design patents, recipes, techniques, customer lists, and/or aspects of goodwill), rebates, profits, revenues, royalties, or other income Defendants have derived in relation to or directly therefrom.

81.    Plaintiffs pray for, without limitation and in the alternative where necessary, an order which includes at least the following:

A.   An order requiring Defendants to provide a comprehensive list and accounting as to all items relative to Settlement Agreement provisions 2, 4, 4.b.,  4.c., 5, 6, 7, 7 a.-b., d., h.-j., 33, and Exhibit C, of all accounts, assets, liabilities, cash on hand, as well as intellectual property assets and all revenues and exploitation obtained in relation thereto, both authorized and unauthorized;

B.   A declaration of ownership and title as to all of the accounts, assets, liabilities, and cash in relation to Settlement Agreement provisions 2, 4, 4.b.,  4.c., 5, 6, 7, 7 a.-b., d., h.-j., 33, and Exhibit C, both authorized and unauthorized;

C.   A constructive trust over all profits and assets accumulated by all of the above named Defendants individually in relation to such accounts, assets, liabilities, cash on hand, as well as intellectual property and other intangible assets;

D.   Other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just, including, inter alia and without exclusion or limitation, U.C.A. § 70-3a-404 (1-4)(injunction, accounting and payment and damages, treble damages, and attorney fees).

## FOURTH CAUSE OF ACTION
## INFRINGEMENT OF TRADEMARK
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., AND DEAN LEHWALDER)*

82.     Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

83.     Iceberg Franchising, LLC is the owner of the Issued and Active US Federal Trademark Registration No. 2689108 (the "'108 Registration") for the word mark ICEBERG DRIVE INN for restaurant services in Class 042, which was registered on the Principle Register on February 18, 2003, and is also one aspect of the "Iceberg IP" bestowed by provision 2 or the Settlement Agreement.

84.     Being on the Principle Register, the '108 Registration is entitled to a presumption of validity, ownership, and exclusive rights to use the mark.

85.     The '108 Registration is acknowledged by the US Patent and Trademark Office ("USPTO") under Section 15 of the Lanham Act as being incontestable.

86.     Defendants operated as Iceberg licensees before the Settlement Agreement was executed at the Christensen Iceberg Stores.

87.     Iceberg Franchising, LLC, through continual and substantial use in commerce over many years by its licensees, including Defendants, has a protectable interest in the ICEBERG branding (including the word mark ICEBERG and the associated designs) for restaurant services

at least in the geographic locations spanned by its franchisees, which at least includes the Utah cities of: Sandy, Taylorsville, Syracuse, and Orem.

88.     Pursuant to the Section 4 of the Settlement Agreement, Defendants license to use Iceberg IP, including but not limited to the Iceberg Trademarks, at the Christensen Iceberg Stores terminated on or about April 12, 2017, 365 days after the final signature was executed on the Settlement Agreement.

89.     The Christensen Iceberg Stores, under the direction and with the assistance of, inter alia, the defendants named to this cause of action, continued to use the ICEBERG DRIVE INN and the ICEBERG marks after April 12, 2017 in commerce in a form and manner substantially identical to that used by the Christensen Iceberg Stores while under license.

90.     The Christensen Iceberg Stores use employees of Caleys Catering in the performance of restaurant services at Christensen Iceberg Stores who wear uniforms and use napkins that are associated with and/or include the ICEBERG word mark.

91.     The Christensen Iceberg Stores continued to use the ICEBERG DRIVE INN and the ICEBERG marks after April 12, 2017 on signs and in marketing and advertising associated with their performance of restaurant services to the public, a competing service to that of Iceberg Franchising, LLC, without the consent of Iceberg Franchising, LLC.

92.     The continued use of the ICEBERG DRIVE INN and ICEBERG marks by Defendants after April 12, 2017 is done while selling substantially the same food in identical locations using substantially identical branding and trade dress to a substantially identical

consumer base as that which occurred under license, and therefore such use is likely to cause confusion as to the affiliation of Defendants with Iceberg Franchising, LLC.

93.     Pursuant to the Settlement Agreement, Defendants were sufficiently aware of the trademark rights held by Iceberg Franchising, LLC and had agreed to stop using the same when the license to those marks terminated.

94.     Defendants willfully infringed Iceberg Franchising, LLC's rights in its trademarks, and without limitation the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and the complaint.

95.     Pursuant to Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125 and Utah Common Law (*see generally, Donhez v. Coors Brewing Co.,* 392 F.3d 1211 (10th Cir. 2004)), Plaintiffs are entitled to, inter alia, lost profits, damages, attorneys' fees, and treble damages for willful infringement.

96.     Plaintiffs pray for injunctive relief barring Defendants from using any of Iceberg's marks and any confusingly similar thereto, an accounting for profits, monetary damages, attorneys' fees, and treble damages pursuant to common law and 15 U.S.C. § 1117, and other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just, including, inter alia and without exclusion or limitation.

**FIFTH CAUSE OF ACTION**
**INFRINGEMENT OF TRADE DRESS**
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE*
*COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT*
*COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC;*
*TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC;*
*SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC,*
*ICEBERG, INC., AND DEAN LEHWALDER)*

97.     Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

98.     Iceberg, consistently across its licensees, includes the following trade dress (collectively, the "Iceberg Trade Dress") in association with the providing of restaurant services in commerce:

A.   The Iceberg menu

B.   Serving "over the top" shakes by putting a cup into a larger cup and serving the shake therein

C.   Providing striped shake cups

D.   Serving distinctively oversized onion rings (thickness and diameter)

E.   The Iceberg checker-board-style tile at the order counter

F.   The Iceberg red/black/white color scheme in the interior of the store

G.   The Iceberg 50's-60's interior décor

H.   The Iceberg exterior paint schema

I.   Blue and white striped decorations

J.   The distinctive Iceberg awnings and sign shapes

      K.   The Iceberg "famous thick shakes," "all shakes thick thick thick," "world's best shakes," and "one taste and it's a tradition" taglines

99.     The Iceberg Trade Dress is unique to Iceberg franchise stores.

100.    The Iceberg Trade Dress is owned, via exclusive use in commerce over a period of years under license from Iceberg, by Iceberg under Section 43(a) of the Lanham Act and pursuant to, inter alia, Sections 3.05 and 3.06 of the Franchise Agreement.

101.    The Iceberg Trade Dress are not common or basic shapes or designs, are unusual in the field of restaurant services, and are not mere refinements.

102.    The Iceberg Trade Dress has acquired secondary meaning through extensive and exclusive use in commerce over many years at Iceberg franchisee stores through license from Iceberg.

103.    Customers associate Iceberg's Trade Dress with Iceberg and the Iceberg chain of franchises.

104.    Since September 2011, Iceberg has spent over $170,000 on marketing and advertising.

105.    The following Iceberg franchise stores in Utah have been established brick and mortar stores servicing their locality as follows:

      A.   3900 South 900 East SLC, opened on or about April 12, 1960;

      B.   Taylorsville, Utah, opened on or about 2000;

      C.   Orem, Utah, opened on or about 2001;

      D.   St George, Utah, opened on or about 2001;

    E.  Logan, Utah, opened on or about 2007;

    F.  Payson, Utah, opened on or about 2006;

    G.  Lehi, Utah, opened on or about 2002;

    H.  Sandy, Utah, opened on or about 2004;

    I.  Riverton, Utah, opened on or about 2008;

    J.  Syracuse, Utah, opened on or about 2009;

    K.  Tooele, Utah, opened on or about 2008;

    L.  Fillmore, Utah, opened on or about 2016;

    M.  Vivent Smart Home Arena, Utah, opened on or about 2015;

    N.  Bountiful, Utah, opened on or about 2008;

    O.  Highland, Utah, opened on or about 2009;

    P.  Provo (University Mall), Utah, opened on or about 2009.

106.     Iceberg, through its franchisees, estimates that it has serviced over five million customers over the past 40 years.

107.     The Iceberg Trade Dress is nonfunctional and therefore protectable, in particular:

    A.  The Iceberg menu, as an ordered whole is but one way to present a menu of such items and is but one permutation of menu items which may be presented;

    B.  Serving "over the top" shakes by putting a cup into a larger cup and serving the shake therein is not essential to serving a shake or even serving an over-the top shake and other restaurants serve such shakes either in nested cups of identical size

and/or using domed lids or simply allowing the shake to extend over the top of the cup;

C.   Providing striped shake cups is decorative and is not essential to serving a shake to a customer;

D.   Serving distinctively oversized onion rings is not essential to serving onion rings as evidenced by the many restaurants that serve normal-sized onion rings and wherein serving such onion rings does not alter the quality of the onion rings, but instead merely makes them distinctive;

E.   The Iceberg checker-board-style tile at the order counter is decorative and not essential to serving orders to customers;

F.   The Iceberg red/black/white color scheme in the interior of the store is decorative and not essential to serving orders to customers;

G.   The Iceberg 50's-60's interior décor is decorative and not essential to serving orders to customers;

H.   The Iceberg exterior paint schema is decorative and not essential to serving orders to customers;

I.   The Iceberg awnings and sign shapes are decorative and not essential to serving orders to customers; and

J.   The Iceberg "all shakes thick thick thick," and "one taste and it's a tradition" taglines are distinctive manners of communicating unique qualities of the Iceberg

Shakes, and are non-generic manners of communicating the same, and are therefore decorative and not essential to serving shakes to customers.

108.     Defendants used the Iceberg Trade Dress at the Christensen Iceberg Stores under license from Iceberg in association with providing restaurant services, which license terminated on or about April 12, 2017.

109.     Defendants continued to use the Iceberg Trade Dress in association with providing restaurant services at the Christensen Iceberg Stores, without license or consent of Iceberg and in direct contravention to the Settlement Agreement, after April 12, 2017 in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of such services.  Without limitation, the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and this complaint.

110.     Defendants have continued to use the Iceberg Trade Dress in direct contravention to specific demands to stop made by Iceberg after April 12, 2017.

111.     Defendants continued use of the Iceberg Trade Dress occurs in the context of providing substantially the same menu of items to substantially the same customer base in the exact same locations as that provided by past legitimate Iceberg franchises.

112.     Defendants have made only minor changes to its use of the Iceberg Trade Dress in the Christensen Iceberg Stores over an extended period of time since April 12, 2017, which is likely to cause confusion among ordinary customers as such small changes over large periods of

time happening at a location which has been an Iceberg franchise for a long period of time is likely to go unnoticed by the ordinary consumer, in particular

    A.  The Iceberg menus have only changed in that some imagery has been changed, but the items, their names, choices, and combos and their order have remained substantially identical;

    B.  Serving "over the top" shakes by putting a cup into a larger cup and serving the shake therein has continued substantially unchanged;

    C.  Providing striped shake cups has continued substantially unchanged;

    D.  Serving distinctively oversized onion rings has continued in that while the onion rings are no longer as thick as Iceberg Onion Rings, they are still substantially thicker than onion rings from competing chains and substantially identical in diameters to Iceberg onion rings;

    E.  The Iceberg checker-board-style tile at the order counter remain in the Christensen Iceberg Stores but the red tiles thereof (the least frequent color of the three black/white/red colors) have been covered, but the pattern, location, and presence of the tiles remains;

    F.  The Iceberg red/black/white color scheme in the interior of the store has not been changed except for covering red tiles near the order counter, while red remains a prominent decorative element throughout the rest of the interior;

    G.  The Iceberg 50's-60's interior décor has not been changed at all;

    H.  The Iceberg exterior paint schema has not been changed at all;

I. The Iceberg awnings and sign shapes have not been changed at all;

J. The Iceberg "famous thick shakes," "all shakes thick thick thick," "world's best shakes," and "one taste and it's a tradition" taglines continue to be displayed in association with providing restaurant services;

113. Plaintiffs pray for, without limitation or exclusion, injunctive relief barring Defendants from using any of Iceberg's Trade Dress and requiring Defendants to formally close the Christensen Iceberg Stores until they may be reopened under different branding and trade dress thereby demarking a clear transition to the ordinary consumer that the store is not an Iceberg store and to prevent trade dress dilution thereby, that Defendants provide an accounting for profits, for monetary damages, attorneys' fees, and treble damages pursuant to common law and 15 U.S.C. Sections 1116 and 1117, and other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just, and where relevant as subject to proof.

**SIXTH AND SEVENTH CAUSES OF ACTION**
**MISSAPROPRIATION OF TRADE SECRETS UNDER FEDERAL LAW**
**AND MISAPPROPRIATRION OF TRADE SECRETS UNDER UTAH LAW**
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., HOLLIE JOHANSON, AND DEAN LEHWALDER)*

114. Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

115. Iceberg owns trade secrets (collectively the "Iceberg Trade Secrets") entitled to

relief and protection under, inter alia, the Federal Defend Trade Secrets Act of 2016 ("DTSA") (including without limitation 18 U.S.C. §§ 1836 (b)(1), (b)(3)(A)(i-ii), (B)(i-ii), (C), (D)), specifically Iceberg's:

    A.  Customer and prospect lists

    B.  Marketing campaign protocols

    C.  Menu item recipes

    D.  Operational practices and protocols as outlined in its forms, manuals, and procedure sheets.

116.      Similarly, Iceberg owns trade secrets (collectively the "Iceberg Trade Secrets") as defined under Utah State Law (Title 13, Chapter 24 – Uniform Trade Secrets Act) specifically its:

    A.  Customer and prospect lists

    B.  Marketing campaign protocols

    C.  Menu item recipes

    D.  Operational practices and protocols as outlined in its forms, manuals, and procedure sheets.

117.      The Iceberg Trade Secrets are related to products and services used and intended for use in interstate commerce, wherein customers from states outside of Utah frequent Iceberg franchise stores and wherein credit cards and interstate banking are used to pay for the goods and services associated therewith.

118.      The Iceberg Trade Secrets are provided to Iceberg employees and employees of Iceberg franchisees on a need to know basis and are not published publicly.

119.     The Iceberg Trade Secrets are protected by confidentiality agreements by and between Iceberg and its franchisees and their employees, pursuant to at least Sections 3.09 – 3.11 of the Franchise Agreement, and also by, inter alia, provisions 2 and 4 of the Settlement Agreement.

120.     The Iceberg Trade Secrets are not generally known or readily ascertainable to competitors.

121.      The Iceberg Trade Secrets has value to Iceberg and to Iceberg's competitors because acquiring such information is costly and knowing such information reduces the cost to find, acquire, and service customers or restaurant services.

122.     The Iceberg Trade Secrets derive independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use at least because the Iceberg Trade Secrets include information that a competitor may use to take market-share from Iceberg or to mimic Iceberg in the marketplace and therefore there is economic value to Iceberg that such information remain secret.

123.     Iceberg has taken reasonable efforts to keep the Iceberg Trade Secrets secret by denoting/marking items as confidential, restricting access thereto and by requiring those who have access to agree to confidentiality.

124.     Defendants, on information and belief, have disclosed and continue to disclose Iceberg Trade Secrets with their employees who are not Iceberg franchisee employees without the consent of Iceberg.

125.     Defendants, on information and belief, have shared and continue to share Iceberg Trade Secrets with their employees who are not under obligation to Defendants or to Iceberg to keep the Iceberg Trade Secrets secret without the consent of Iceberg.

126.     Defendants, on information and belief, have, in locations accessible to their non-Iceberg employees, possession of confidential materials in such a manner that those non-Iceberg employees have access to such confidential materials.  Without limitation the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and this complaint.

127.     As part of its Sixth Cause of Action Plaintiffs seek relief under DTSA, including without limitation all relief and remedies set forth under, inter alia, 18 U.S.C. §§ 1836 (b)(1), (b)(3)(A)(i-ii), (B)(i-ii), (C), (D) as may be necessary and just, including, inter alia and without exclusion or limitation, for injunctive relief including seizure of all confidential materials in the possession or control of Defendants related to Iceberg Trade Secrets and for the preservation of secrecy by ordering all who have unlawfully come in contact with Iceberg Trade Secrets be ordered not to disclose the same, as well as, inter alia, special master oversight of Defendants, damages, exemplary damages, and attorneys' fees and other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages available through the DTSA or otherwise.

128.     As part of its Seventh Cause of Action Plaintiffs seek relief under Uniform Trade Secrets Act, including under, inter alia, Utah Code ¶¶ 13-24-3 through 13-24-6 as may be necessary and just, including, inter alia and without exclusion or limitation, for injunctive relief

including seizure of all confidential materials in the possession or control of Defendants related to Iceberg Trade Secrets and for the preservation of secrecy by ordering all who have unlawfully come in contact with Iceberg Trade Secrets be ordered not to disclose the same, as well as, inter alia, damages, exemplary damages, and attorneys' fees and other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages available through the Utah Uniform Trade Secrets Act or otherwise through Utah law..

## EIGHTH CAUSE OF ACTION
## FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., AND DEAN LEHWALDER)*

129.     Plaintiffs incorporates all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

130.     Defendants, by continuing to operate previously legitimate Iceberg licensed stores without properly converting the same to a substantially different brand in a manner that effectively communicates a change in source to the relevant consumer base, are liable under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false designation of origin and false description and representations in interstate commerce.

131.     Iceberg Franchising, LLC ("Iceberg") has expended large sums of money to maintain the uniformly high quality of its goods and to maintain the reputation of the goods promoted, sold or offered for sale under Iceberg's Mark.

132.     Iceberg's services, their marks and associated trade dress are recognized as distinctive and have developed secondary trademark meaning to consumers and potential consumers of Iceberg's services.

133.     Defendants' use of Iceberg's Marks and use of Iceberg's design, artwork, and trade dress in connection with the production and sale of Defendants' services constitute false designations of origin, false description and representation, and occurred in the course of Defendants' commercial and advertising activities. The acts of Defendants are likely to cause mistake or to deceive as to the affiliation, connection or association of Defendants with Iceberg as to the origin, sponsorship or approval of its goods in violation of 15 U.S.C. § 1125(a)(l)(A). Without limitation the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and this complaint.

134.     Iceberg has been and continues to be damaged by Defendants' activities and is entitled to recover Defendants' profits received as a result of the infringement as a measure of its actual damages pursuant to 15 U.S.C. § 1117(a). In addition, unless Defendants' conduct is enjoined, Iceberg will suffer irreparable injury which cannot be adequately compensated by money damages and, accordingly, Iceberg is entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

135.     Accordingly, pursuant to 15 U.S.C. §§ 1116, 1117, Plaintiffs request and pray for actual damages and for an order that enjoins Defendants from using any of Iceberg's artwork, designs, trade dress, and trademarks, registered or otherwise, in the performance of restaurant services and that attendant equitable remedies be accorded in relation thereto and, inter alia and

without exclusion or limitation, other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just.

### NINTH CAUSE OF ACTION
### LANHAM ACT – FALSE ADVERTISING
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., AND DEAN LEHWALDER)*

136.     Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

137.     Defendants, by continuing to operate previously legitimate Iceberg licensed stores without properly converting the same to a substantially different brand in a manner that effectively communicates a change in source to the relevant consumer base, are liable under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false designation of origin and false description and representations in interstate commerce.

138.     In the process of marketing their goods, Defendants has made material misrepresentations about the nature, characteristics, qualities or geographic origin of Defendants' Goods or of Iceberg's Goods.

139.     By publishing or causing to be published false or misleading statements of fact regarding Defendants services, Defendants has deceived or may deceive Iceberg's existing and potential customers regarding the nature, characteristics and quality of Iceberg's services.

140.     Such false statements have caused Iceberg to lose business opportunities and have

reduced Iceberg's income and earnings.

141.     Defendants' use of Iceberg's Marks and Trade Dress in commercial advertising or promotion misrepresents the nature, characteristics, qualities or geographic origin of the goods, services or commercial activities in violation of 15 U.S.C. § 1125(a)(l)(B).  Without limitation the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and this complaint.

142.     Plaintiffs pray for injunctive relief for Defendants' violation of section 43(a) of the Lanham Act and Iceberg, pursuant to 15 U.S.C. § 1116 and other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just, including, inter alia and without exclusion or limitation.

## TENTH CAUSE OF ACTION
## VIOLATION OF THE UTAH DECEPTIVE TRADE PRACTICES ACT
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., AND DEAN LEHWALDER)*

143.     Plaintiffs incorporates all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

144.     Defendants has engaged in deceptive trade practices in violation of Section 13-11a-1, et seq., of the Utah Code in that Defendants has engaged in conduct that creates a likelihood of confusion or of misunderstanding between the goods of Defendants and Iceberg's Goods, as well as their characteristics, qualities, sponsorship, approval, and affiliation.

145.     Upon information and belief, Defendants knows or reasonably should have known of the deceptive character of its alleged conduct.   Without limitation the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and this complaint.

146.     Without limitation or exclusion, Iceberg prays for relief in the actual amount of damages sustained by Iceberg or, in the alternative, such other relief as may be available pursuant to section 13-11a-1, et seq. and other equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just.

**ELEVENTH CAUSE OF ACTION**
**INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS**
*(AGAINST F. KELLY CHRISTENSEN; ANCHOR HOLDING COMPANY, LLC; 4C SHAKE COMPANY, LLC; FOUR C FAMILY INVESTMENT, LLC; SHAKING IT UP MANAGEMENT COMPANY, LLC; MOTOR CITY SHAKE COMPANY, LLC; OREM SHAKE COMPANY, LLC; TAYLORSVILLE SHAKE COMPANY, LLC; CALEY'S CATERING & EVENTS, LLC; SHAKEMAKERS, LLC; SHAKEMAKERS II, LLC, ICEBERG OPPORTUNITIES, LLC, ICEBERG, INC., AND DEAN LEHWALDER)*

147.     Plaintiffs incorporates all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

148.     Defendants have copied Iceberg's design, artwork, and Operational Materials with the intention and effect of diverting sales from Iceberg to Defendants and/or with the intention of preventing Iceberg from franchising stores near the Christensen Iceberg Stores.

149.     Defendants have intentionally maintained a similar appearance, trade dress, menu, and services similar to Iceberg's and Defendants has deceived or may deceive Iceberg's existing customers regarding the nature, characteristics and quality of Iceberg's Goods.

150.     Defendants have intentionally interfered with, diverted, and depressed existing and potential customers and customer business of Plaintiffs and Iceberg by improper means by infringement of Iceberg's copyright and trademark, unfair competition, false advertising and unfair practices.

151.     Defendants have intentionally and improperly caused Iceberg to lose sales and has injured Iceberg.

152.     Defendants intentionally interfered with actual and prospective economic relations by the improper means set forth herein.

153.     Defendants' conduct was and is willful, malicious, and intentional and manifests a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiffs.  Without limitation, the individuals named to this cause of action have directed and assisted the relevant entities to engage in the wrongful acts described in this cause of action and this complaint.

154.     Defendants' conduct involves improper means, which violate both federal and Utah law, and also violate contractual obligations as well as customs and standards in the franchise industry.

155.     By reason of such conduct on the part of Defendants, Iceberg has been damaged and irreparably harmed in an amount to be determined at trial, and Iceberg will continue to suffer such harm.

156.     Without exclusion or limitation, Iceberg prays for, inter alia, relief in damages, injunctive relief in the form of an order to close the Christensen Iceberg Stores until such time as they no longer improperly interfere with Iceberg's economic relations, attorneys' fees, and other

equitable, injunctive, declaratory, monetary, exemplary, special, statutory, and/or punitive relief or damages as may be necessary and just.

157.     At the time they interfered, Defendants and each of them were without legal justification in interfering and had knowledge of that fact.

158.     Plaintiffs are entitled to recover all compensatory damages to make itself whole, including all of the special damages flowing from such tortious activities, and all reasonably foreseeable special and consequential damages.

159.     The acts of Defendants were undertaken with a willful disregard for the right(s) and interest(s) of Plaintiffs, entitling Plaintiffs to a punitive damages award in conformity with the principles of *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003).

**TWELFTH CAUSE OF ACTION**
**DECLARATION REGARDING SCOPE OF ARBITRATION CLAUSE AND ORDER TO ARBITRATION PURSUANT TO THE SETTLEMENT AGREEMENT AND THE FEDERAL ARBITRATION ACT**
*(AGAINST ALL DEFENDANTS)*

160.     In response to the acts and omissions of Defendants as set forth in this Complaint, Plaintiffs attempted to invoke and institute functional arbitration pursuant to provision 4 of the Settlement Agreement with regard to the defendant individuals and entities who signed the Settlement Agreement.  However, on and around the week of April 22-28, 2017, those of the Defendants who had signed the Settlement Agreement communicated demands with regard to the powers of the arbitrator, scope of subject matter, procedures, remedies, enforceability, and other details associated with arbitration that were unacceptable and would have had the effect of

engendering an arbitration too diluted, constricted, ineffectual, and at odds with the original intent and terms of the Settlement Agreement to afford meaningful relief.

161.     Plaintiffs seek an order interpreting and enforcing the Settlement Agreement, which order would, inter alia, declare the powers of the arbitrator, scope of subject matter, procedures, remedies, enforceability, and other details associated with arbitration, order compliance and appointment of a binding arbitrator for such matters, and refer all relevant disputed matters and signatories of the Settlement Agreement as set forth in this Complaint to arbitration which are required to be arbitrated pursuant to the Settlement Agreement.  Plaintiffs seek such order pursuant to not only, inter alia, 28 U.S.C. §§ 2201 (a), 2202 (permitting federal courts to grant "[f]urther necessary or proper relief based on a declaratory judgment"), but also to , inter alia, the Federal Arbitration Act, 9 U.S.C. §§ 2 ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable . . ."), 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action . . . of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and . . . shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."), 5 ("If in the agreement provision be made for a

method of naming or appointing an arbitrator or arbitrators . . . such method shall be followed . . . "); 206 ("A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.").

162.     Plaintiffs further respectfully request that the Court resolve all matters in this Complaint not required to be arbitrated under the Settlement Agreement, if any, and/or disputes involving non-signatories to the Settlement Agreement, on a parallel litigation track, even as the matters referred for arbitration through order are simultaneously being resolved by the binding arbitrator.

163.     Plaintiffs further request that once the binding arbitrator has rendered decision and award in regard to the arbitrated matters, the Court then grant an order, judgment, and (as needed) remedies confirming the arbitration award, and further grant order and judgment resolving all other matters, if any, that the Court has ruled adjudicated in litigation before it rather than through arbitration, so that all disputed issues in the Complaint are resolved and integrated, comprehensive, adequate remedies and solutions are achieved as needed to afford meaningful, cohesive, and full relief and remedy to Plaintiffs in regard to all issues in the Complaint.   See, e.g., 9 U.S.C. ¶ 9 ("If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order . . . .").

### THIRTEENTH CAUSE OF ACTION
### CIVIL CONSPIRACY
*(AGAINST EACH AND EVERY DEFENDANT)*

164.     Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if set forth here in full.

165.     Each of the Defendants in this matter has acted in concert, by way of a combination of two or more persons. Christensen has acted as a key player, self-dealer, and lynchpin of the conspiratorial scheme, which is designed to facilitate, enable, ratify, profit from, process or conceal assets and funds for, and otherwise promulgate the wrongful acts and omissions set forth in this Complaint.

166.     The conspiracy (and the individual involvement of each defendant) had the object and designs (fully or in substantial part) described and alleged in the previously delineated paragraphs, but specifically included the scheme, plan, opportunity and actual benefit derived from the wrongful acts and violations of Settlement Agreement set forth herein, with the purpose of harming Plaintiffs and of depriving Plaintiffs of such benefits and profits to which Plaintiffs are entitled.

167.     In sum, Christensen and the above-captioned Defendants (through the acts described and referenced above) conspired to obtain benefits from their involvement and association with each other while at the same time purposefully circumventing Plaintiffs' rightful and contractual role pursuant to the Settlement Agreement and to obtain financial and other benefits by circumventing, concealing, and ignoring Defendants' individual and collective obligations under the Settlement Agreement and under the law toward Plaintiffs.

168.     There was a meeting of the minds between each combination of two or more conspirators as to the object of the conspiracy and/or the courses of action by which it would be carried forward as it pertained to each individual Defendant and each defendant's acts and/or actions in support of the conspiracy.

169.     Each of the Defendants, as a conspirator, undertook one or more unlawful, overt acts in furtherance of the conspiracy, and has functioned in coordination with Christensen to engage in the wrongful conduct described in this Complaint and to breach the Settlement Agreement.

170.     The acts of one or more conspirators in furtherance of the object of the conspiracy have been the cause-in-fact and legal cause of damages to Plaintiffs, in a sum to be proven based on the evidence at trial.  Plaintiffs are entitled to recover all such compensatory damages to make itself whole, including all of its special damages in pursuing other claims against the Defendants in this matter and the reasonably foreseeable consequential and special damages.

171.     The acts of the conspirators were undertaken with a willful disregard for the rights and interests of Plaintiffs, entitling Plaintiffs to a punitive damages award in conformity with the principles of *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), as well as the various statutory provisions for treble, exemplary, punitive, double, imputed, and other varieties of damage as provided under the various intellectual property statutes and trade secret statutes of the United States and of Utah.

172.     The entities and Defendants named in this Complaint have been named because,

inter alia, they have been engaged in acts and omissions improperly harmful to Plaintiffs, and/or

they have been unjustly enriched through Christensen's conduct, and/or the entities play a role in

the functioning of the Defendants' scheme, and/or it is necessary that they be named so that the

Court can be empowered to render effective, comprehensive, coherent, and effective orders,

declarations, and remedies binding against all entities relevant to the controversy.

**FOURTEENTH CLAIM**
**SEEKING DECLARATORY JUDGMENT**
*(AGAINST ALL DEFENDANTS)*

173.     Plaintiffs incorporate all preceding paragraphs, and all subsequent paragraphs, as if

set forth here in full.

174.      A true, present and justiciable controversy exists between Plaintiffs and all of the

named Defendants in this matter regarding interpretation of, and compliance with, the terms of the

Settlement Agreement signed by all the Parties to this legal action.

175.     A true, present and justiciable controversy exists between Plaintiffs and all of the

named Defendants in this matter regarding the rights, duties, and obligations that arise in

conjunction with the Settlement Agreement and with other related and derivative obligations,

including without limitation those related to protection of Iceberg IP from misuse.

**<u>DECLARATIONS SOUGHT BY PLAINTIFFS</u>**

176.     First, Plaintiffs seek declarations and order in relation to all previous aspects of the

Complaint where such are requested and/or practically necessary for Plaintiffs to receive relief.

177.     Second, Plaintiffs seek a declaration and order ruling that the Defendants must

- 54 -

cease and desist from all violations of the Settlement Agreement set forth in this Complaint, and from all wrongful acts set forth in this Complaint.

178.      Third, Plaintiffs seek a declaration and order to resolve all necessary issues regarding arbitration, as set forth in more detail elsewhere in the Complaint.

179.      Fourth, Plaintiffs seek a declaration that Defendants must render an accounting as required by the Settlement Agreement and also as sought by this Complaint pursuant to misuse and harm imposed relative to revenues and Iceberg IP of the Plaintiffs.

180.      Iceberg IP as defined by the Settlement Agreement and under relevant federal and Utah law is inherently distinctive and/or has acquired distinctiveness, and otherwise has value, and requires declaratory protection against the harmful acts and omissions of Defendants complained of herein.

181.      Plaintiffs have suffered, and will continue to suffer, actual irreparable harm and are threatened with further irreparable harm as the result of the acts, patterns, performances, and omissions of the Defendants in this matter and Plaintiffs have no adequate remedy at law without immediate injunctive relief.  Provision 12 of the Settlement Agreement expressly indicates that "Without limitation, the Parties shall be able to enforce the provisions of this Agreement through declaratory, injunctive, equitable, monetary, special, and punitive relief; through specific performance; through an accounting reasonably tailored to a verification or remedy in relation to the grievance or concern asserted; and through law, equity, and all available theories of local, state, federal, treaty, and international law."   Plaintiffs are therefore entitled to preliminary and

permanent injunctive relief barring any Defendants from Defendants' wrongful acts and omissions.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand declaration, ruling, adjudication, award, order, and judgment in its favor and against each and all of the named Defendants as detailed above, and requests as follows:

1. An award of damages against each Defendant for all such actual damages, compensatory damages, and incidental damages (as allowed by law) to make Plaintiffs whole, including but not limited to all special damages, consequential damages, and prejudgment interest thereon at the legal rate -- all where appropriate as requested above and/or as pertaining to each cause of action as detailed, delineated and specified above in various portions of this Complaint;

2. For punitive damages;

3. For Defendants' stores at Non-Compliant Locations and Kelly's Catering to be ordered closed until such time as they can re-open with buildings, facilities, fixtures, equipment, trade dress, intellectual property, food, beverages, and operations that are fully in compliance with the requirements of the Settlement Agreement and all resultant awards, orders, decisions, rulings, and judgments of the arbitrator and/or Court as applicable:

4. For any and all Plaintiff's attorney's fees, costs and expenses as may be allowed by the Settlement Agreement, at law, in equity, by case, statute, rule, inherent

power of the Court or otherwise, in connection with all components, causes of actions, claims, and requests set forth anywhere in this Complaint;

5.     For declaratory and injunctive relief as requested and detailed above and in all relevant portions of this Complaint;

6.     For declaratory, injunctive, equitable, monetary, special, and punitive relief; specific performance; an accounting; a special master; binding arbitration; equitable, injunctive, declaratory, monetary, exemplary, special, consequential, statutory, treble, double, and/or punitive relief or damages as such are requested anywhere in this Complaint, or as such are required to enforce any provision of the Settlement Agreement or authorized by any provision of the Settlement Agreement, or as such may be authorized or allowed in connection with any statutory scheme, provision, or cause of action set forth in this Complaint, or as needed to make the Plaintiffs whole in relation to any and all components, claims, causes of action, and prayers set forth in this Complaint; and

7.     For such other and further relief as the Court deems just, equitable or proper.


DATED: June 23, 2017

Pearson, Butler & Carson, PLLC

/s/ Daniel E. Witte
Daniel E. Witte
Attorney for Plaintiff